73108
AMOUNT $ 350
SUMMONS ISSUED  Y-1
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE   6-13-06

FILED
IN CLERKS OFFICE

2006 JUN 13 · A 11: 57

U.S. DISTRICT COURT
DISTRICT OF MASS.

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

06 cv 11029 MLW

MAGISTRATE JUDGE RBC

| | |
|---|---|
| NEW SOUTH WALES TREASURY CORPORATION, AS TRUSTEE FOR THE ALPHA INTERNATIONAL MANAGERS TRUST, Derivatively on Behalf of AMERICAN TOWER CORPORATION, ) ) ) ) ) | No. |
| Plaintiff, ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CONSTRUCTIVE FRAUD, CORPORATE WASTE, UNJUST ENRICHMENT, GROSS MISMANAGEMENT, BREACH OF CONTRACT AND ACTION FOR ACCOUNTING |
| vs. ) | |
| STEVEN B. DODGE, JOSEPH L. WINN, JAMES S. EISENSTEIN, JAMES D. TAICLET, JR., BRADLEY E. SINGER, J. MICHAEL GEARON, JR., STEVEN J. MOSKOWITZ, PAUL M. ALBERT, JR., STEPHEN H. CLARK, RAYMOND P. DOLAN, CAROLYN F. KATZ, GUSTAVO LARA CANTU, FRED R. LUMMIS, PAMELA D.A. REEVE, AND SAMME L. THOMPSON, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | DEMAND FOR JURY TRIAL |
| – and – ) | |
| AMERICAN TOWER CORPORATION, a Delaware corporation, ) ) | |
| Nominal Defendant. ) ) ) | |

## SUMMARY AND OVERVIEW OF THE ACTION

1.      This is a shareholder derivative action on behalf of nominal defendant American Tower Corporation ("American Tower" or the "Company") against its current Board of Directors and certain current and former top officers and directors for violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement arising out of a scheme and wrongful course of conduct whereby Defendants allowed the backdating of stock option grants to and for the benefit of American Tower's directors and top executive officers, including the Company's founder, former Chairman and former Chief Executive Officer ("CEO"), Steven B. Dodge ("Dodge"), and/or failed to properly investigate whether these grants had been improperly made. Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these insiders to disgorge the illicitly obtained incentive compensation and proceeds diverted to them since at least 1998. Each of the Defendants either knew of the backdating and were participants in the fraudulent and unlawful conduct or should have known of this conduct and done more about it.

2.      Stock option grants give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually does not vest for a year or more, but then it continues for several years. The exercise price is usually the stock's closing price on the date of grant. Obviously, the lower the exercise price, the more money the recipient can potentially make some day by exercising the options.

3.      On May 16, 2006, the Center for Financial Research & Analysis ("CFRA") issued a report that identified a group of companies that had a higher risk profile for options backdating. CFRA surveyed 100 companies with the highest ratio of total stock compensation as a percentage of their average revenue for the six years ended in December 2002. Of those 100 companies, 17

- 1 -

companies, including American Tower, had three or more option grants that appeared unusual compared to stock prices just before or after the grant date.

4.    Backdating the date of issuance of Defendant Dodge's stock option grants, among others, not only violated American Tower's publicly disclosed stock option plans, which provided that "the exercise price may not be less than the fair market value[1] of the shares on the date the option is granted," but it also was in breach of defendants' fiduciary duties of good faith, fair dealing and loyalty to American Tower.

5.    Defendants' conduct has unjustly enriched American Tower's current and former top executives, including Defendant Dodge, to the detriment of American Tower and its public shareholders. A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. Backdating them so they carry a lower price runs counter to this goal, giving the recipient a "paper profit" right from the start. For example, if a company grants options on May 22, when its stock price is $20, but records the date of issue as April 22, when the stock price was only $15, it would be giving those who were granted options a "sure thing."

6.    Due to defendants' conduct, American Tower has been exposed to a costly investigation by the United States Securities and Exchange Commission ("SEC"), as well as to potential costly and expensive lawsuits for violations of the federal securities laws and accounting rules applicable to public companies. As *The Wall Street Journal* explained:

---

[1]    According to American Tower SEC filings, the "fair market value" means "(a) the last reported sales price, regular way, or, in the event that no sale takes place on such day, the average of the reported closing bid and asked prices, regular way, in either case (i) as reported on the New York Stock Exchange Composite Tape...."

Companies have a right to give executives lavish compensation if they choose to, but they can't mislead the shareholders about it. Granting an option at a price below the current market value, while not illegal in itself, could result in false disclosure. That's because companies grant their options under a shareholder-approved "option plan" on file with the SEC. The plans typically say options will carry the stock price of the day the company awards them or the day before. If it turns out they carry some other price, the company could be in violation of its options plan, and potentially vulnerable to an allegation of securities fraud.

It could even face accounting issues. Options priced below the stock's fair value when they're awarded bring the recipient an instant paper gain. Under accounting rules, that's equivalent to extra pay and thus is a cost to the company. A company that failed to include such cots in its books may have overstated its profits, and might need to restate past financial results.

7.    Professor Stephen Bainbridge, Professor of Corporate Law at UCLA, agrees:

There's nothing inherently illegal about either paying large compensation or even backdating an option contract, so long as proper corporate procedures were followed and the grant does not amount to a waste of corporate assets. Where public corporations are concerned, however, failure to disclose the backdating likely would constitute securities fraud. In particular, failure to do so probably would constitute a material omission with respect to the executive compensation disclosures required in the proxy statement for the corporation's annual meeting.

Stephen Bainbridge, Option Grant Timing, March 18, 2006
http:www.professorbainbridge.com/2006/03/index.html.

8.    Moreover, as a result of Defendants' conduct, the Company's proxy materials that

have been filed with the SEC are false and misleading, the Company may be liable for illegal insider

trading, the Company may be in violation of certain provisions of the Internal Revenue Code since it

may not be able to deduct the options payments from its taxable income and the Company may need

to restate its financial results for prior periods since it should have accounted for the options as a

compensation expense which would reduce the Company's net income in periods prior to fiscal

2006.

9    By this action, plaintiff seeks to recover damages and other relief against defendants

for the severe injuries their misconduct has inflicted upon American Tower.

- 3 -

## JURISDICTION AND VENUE

10. The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and under Massachusetts law for violations of breach of fiduciary duty, abuse of control, constructive fraud, waste of corporate assets, unjust enrichment and gross mis nanagement. In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

11. This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

12. Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. American Tower is located in and conducts its business in this District.

## THE PARTIES

13. Plaintiff New South Wales Treasury Corporation, as Trustee for the Alpha International Managers Trust, is currently a shareholder of American Tower.

14. Nominal Defendant American Tower is a Delaware corporation with its executive offices and principal place of business located in Boston, MA. American Tower and its subsidiaries engage in the ownership, operation, and development of wireless and broadcast communications sites in the United States, Mexico, and Brazil.

15. Defendant Dodge was the founder of the Company. He was Chairman of the Board from July 1995 to February 2004. He also served as CEO of the Company from June 1998 to

- 4 -

October 2003. As Chairman of the Board of Directors and CEO, he caused or permitted the backdated stock options described herein to be granted. Defendant Dodge also personally benefited from the backdated stock options, as described herein. Moreover, because of Defendant Dodge's position, he was aware of non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Dodge participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

16. Defendant Joseph L. Winn ("Winn") was the Company's Vice Chairman from January 2002 to 2003. He also served as the Company's Chief Financial Officer from June 1998 to December 2001. Because of Winn's position, he caused or permitted the backdated stock options described herein to be granted. Defendant Dodge also personally benefited from the backdated stock options, as described herein. Moreover, because of Defendant Winn's position, he was aware of non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Winn participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

17. Defendant James S. Eisenstein ("Eisenstein") was the Company's Executive Vice President and Chief Operating Officer ("COO"). Because of Eisenstein's position, he caused or permitted the backdated stock options described herein to be granted. Defendant Eisenstein also personally benefited from the backdated stock options, as described herein. Moreover, because of

- 5 -

Defendant Eisenstein's position, he was aware of non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Eisenstein participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

18.     Defendant James D. Taiclet, Jr. ("Taiclet") is the Company's Chairman, President and CEO. From September 2001 to October 2003, he was the Company's President and COO. He has been a director since November 2003. Because of Taiclet's position, he caused or permitted the backdated stock options described herein to be granted. Defendant Taiclet also personally benefited from the backdated stock options, as described herein. Moreover, because of Defendant Taiclet's position, he was aware of non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Taiclet participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

19.     Defendant Bradley E. Singer ("Singer") has been the Company's CFO and Treasurer since December 2001. Because of Singer's position, he caused or permitted the backdated stock options described herein to be granted. Moreover, because of Defendant Singer's position, he was aware of non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended

- 6 -

Board meetings. During the relevant period, Singer participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

20. Defendant J. Michael Gearon, Jr. ("Gearon") has been the Company's Vice Chairman and President of American Tower International since January 2002. He was a member of the Company's board of directors from January 1998 until May 2003. As a member of the Board of Directors, he caused or permitted the backdated stock options described herein to be granted. Defendant Gearon also personally benefited from the backdated stock options, as described herein. Moreover, because of Gearon's position, he knew non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Gearon participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

21. Defendant Steven J. Moskowitz ("Moskowitz") has been the Company's Executive Vice President since January 2002 and President of its U.S. Tower Division since October 2003. Because of Moskowitz's position, he caused or permitted the backdated stock options described herein to be granted. Defendant Moskowitz also personally benefited from the backdated stock options, as described herein. Moreover, because of Defendant Moskowitz's position, he was aware of non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board

- 7 -

meetings. During the relevant period, Moskowitz participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

22.     Defendant Pamela D.A. Reeve ("Reeve") has been a Director of American Tower since March 2002. Defendant Reeve is the Lead Director of the Board and is the Chairman of the Company's Compensation Committee. As a member of the Board of Directors and of the Compensation Committee, she caused or permitted the backdated stock options described herein to be granted. Moreover, Defendant Reeve knew non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Reeve participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

23.     Defendant Carolyn F. Katz ("Katz") has been a Director of American Tower since February 2004. Defendant Katz is a member of the Company's Compensation Committee. As a member of the Board of Directors and of the Compensation Committee, she knew non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Katz participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

- 8 -

24.     Defendant Raymond P. Dolan ("Dolan") has been a Director of American Tower since February 2003. Defendant Dolan is a member of the Company's Compensation Committee. As a member of the Board of Directors and of the Compensation Committee, he knew non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Dolan participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

25.     Defendant Paul M. Albert, Jr. ("Albert") has been a Director of American Tower since August 2005. As a member of the Board of Directors, Defendant Albert knew non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Albert participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

26.     Defendant Stephen H. Clark ("Clark") has been a Director of American Tower since August 2005. As a member of the Board of Directors, Defendant Clark knew non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant

- 9 -

period, Clark participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

27. Defendant Gustavo Lara Cantu ("Cantu") has been a Director of American Tower since November 2004. As a member of the Board of Directors, Defendant Cantu knew non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Cantu participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

28. Defendant Fred R. Lummis ("Lummis") has been a Director of American Tower since June 1998. As a member of the Board of Directors, he caused or permitted the backdated stock options described herein to be granted. Defendant Lummis also personally benefited from the backdated stock options, as described herein. Moreover, Defendant Lummis knew non-public information about the business of American Tower, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Lummis participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

29. Defendant Samme L. Thompson ("Thompson") has been a Director of American Tower since August 2005. As a member of the Board of Directors, Defendant Thompson knew non-public information about the business of American Tower, as well as its finances, markets and

- 10 -

present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Thompson participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

## DUTIES OF AMERICAN TOWER'S OFFICERS AND DIRECTORS

30. By reason of their positions as American Tower's directors and officers, and because of their ability to control the Company's business and affairs, defendants owed and owe American Tower fiduciary duties of good faith, fair dealing and loyalty, and were and are required to use their utmost ability to control and manage American Tower in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of American Tower so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

31. Each director and officer of the Company owes to American Tower the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as directors and/or officers of a public company, defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial performance and financial results so that the market price of the Company's stock would be based on truthful and accurate information. Defendants, because of their positions of control and authority as directors and/or officers of American Tower, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their senior positions with American Tower, defendants, and each of them, had access to adverse nonpublic information about the unlawful stock option backdating practices and procedures described herein.

- 11 -

32.     At all relevant times, defendants, and each of them, were agents of the other defendants and of American Tower, and were at all times acting within the course and scope of such agency.

33.     To discharge their duties, American Tower's directors and officers were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of American Tower were required to, among other things:

(a)     prevent American Tower's top executives from being granted backdated stock options;

(b)     prevent American Tower's Compensation Committee from granting backdated stock options;

(c)     refrain from acting upon material inside corporate information to benefit themselves;

(d)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- 12 -

(g)     remain informed as to how American Tower conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the applicable federal and state corporation and/or securities laws; and

(h)     ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

## AIDING AND ABETTING AND CONCERTED ACTION

34.     In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

35.     At all relevant times, defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was over-paying its directors, officers and employees via backdated stock option grants; (ii) maintain defendants' directorial and executive positions at American Tower and the profits, power and prestige which defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of American Tower, regarding defendants' management of American Tower's operations, the Company's financial health and stability, and future business prospects, which had been misrepresented by defendants throughout the relevant period. In furtherance of this course of conduct, defendants collectively and individually took the actions set forth herein.

36.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist the commission of the

- 13 -

wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

37.     American Tower and its subsidiaries engage in the ownership, operation, and development of wireless and broadcast communications sites in the United States, Mexico, and Brazil.

38.     Since at least 1998, American Tower, through the actions of its Board of Directors and its Compensation Committee, has granted stock options for the purchase of millions of shares of the Company's common stock to its top executives, including to many of its current or former directors and senior officers named as defendants herein.

39.     In its public filings with the SEC, including in its Stock Option Plan effective November 5, 1997, which was amended and restated on April 27, 1998, American Tower represented that the exercise price:

> may not be less than the "fair market value" of the shares on the date the option is granted. However, in the case of an employee who owns (or is considered to own under Section 424(d) of the Code) stock possessing more than 10% percent of the total combined voting power of all classes of stock of the Company or any of its parent or subsidiary corporations, the price at which shares may be purchased pursuant to an ISO may not be less than 110% of the fair market value of the class of Common Stock covered by the option on the date the ISO is granted.

40.     The Company's stock option plan defines "fair market value" as:

> (a) the last reported sales price, regular way, or, in the event that no sale takes place on such day, the average of the reported closing bid and asked prices, regular way, in either case (i) as reported on the New York Stock Exchange Composite Tape, or (ii) if the Stock is not listed or admitted to trading on the New York Stock Exchange, on the principal national securities exchange on which such security is listed or admitted to trading, or (iii) if not then listed or admitted to trading on any national securities exchange, on the NASDAQ National Market System; or (b) if the Stock is not quoted on such National Market System, (i) the average of the closing bid and asked prices on each such day in the over-the-counter market as reported by NASDAQ, or (ii) if

- 14 -

bid and asked prices for such security on each such day shall not have been reported through NASDAQ, the average of the bid and asked prices for such day as furnished by any New York Stock Exchange member firm regularly making a market in such security selected for such purpose by the Committee; or (c) if the Stock is not then listed or admitted to trading on any national exchange or quoted in the over-the-counter market, the fair value thereof determined in good faith by the Committee as of a date which is within thirty (30) days of the date with respect to which the determination is to be made; provided, however, that any method of determining fair market value employed by the Committee with respect to an ISO shall be consistent with any applicable laws or regulations pertaining to "incentive stock options."

41.     Contrary to the foregoing public disclosures, the options granted under these plans were highly favorable to the option recipients because the stock options were not granted at the "fair market value" on the date of grant but were in fact backdated. In many instances, the grant dates were allegedly dated just before a sharp increase in the trading price of American Tower stock or at the bottom of a steep drop in stock's price.

42.     The practice of backdating options at American Tower, and many other companies, commenced prior to the passage of the Sarbanes-Oxley Act of 2002 ("Sarbanes") on July 30, 2002, when options grants did not have to be reported to the SEC until 45 days after the close of the fiscal year in which the options were granted. Sarbanes amended a section of the Exchange Act and required insiders to file notification of grants within two business days of their receipt.

43.     Defendants took advantage of the pre-Sarbanes rules to perpetrate their scheme. Prior to Sarbanes, Defendant Dodge and others caused and received several grants between 1998 and 2002 at lows in the Company's stock chart. For example:

        (a)     American Tower made four separate stock option grants to Defendants Dodge, Winn, Eisenstein and a former director on June 21, 1998. On that date, Defendant Dodge received a grant of 1.3 million options, Defendant Winn received a grant of 210,000 options, Defendant Eisenstein received a grant of 22,000 options and the former director received a grant of 80,000 options. On June 21, 1998, American Tower stock closed at $21.125, near the bottom of a sharp

- 15 -

drop in the price of American Tower common stock, and preceding a sharp price increase. American Tower stock traded in a range from a low of $13.50 to a high of $29.5625 during 1998.



**American Tower Corp.**
**June 5, 1998 - July 21, 1998**

(b)     American Tower made nine separate stock option grants to Defendants Dodge, Winn, Gearon, Lummis, and Moskowitz, among others, on September 21, 2000. On that date, Defendant Dodge received a grant of 300,000 options, Defendant Winn received a grant of 100,000 options, Defendant Gearon received a grant of 200,000 options, Defendant Lummis received a grant of 15,000 options, Defendant Moskowitz received a grant of 100,000 options, among other grants. On September 21, 2000, American Tower stock closed at $30.625, near the bottom of a sharp drop in the price of American Tower common stock, and preceding a sharp price

- 16 -

increase. American Tower stock traded in a range from a low of $29.00 to a high of $37.875 during 2000.



**American Tower Corp.**
August 21. 2000 - October 23. 2000

(c)     American Tower made one stock option grant each to Defendants Eisenstein and Moskowitz on April 3, 2001 and April 9, 2001, respectively.  On those dates, Defendant Eisenstein received a grant of 5,000 options and Defendant Moskowitz received a grant of 10,000 options.  On those dates, American Tower stock closed at $14.45 and $15.40, near the bottom of a sharp drop in the price of American Tower common stock, and preceding a sharp price increase. American Tower stock quickly reached as high as $28.00 per share on May 7, 2001.

- 17 -



**American Tower Corp.**

**March 2, 2001 - May 3, 2001**

      (d)      American Tower made one stock option grant to Defendant Taiclet on October 4, 2002. On that date, Defendant Taiclet received a grant of 175,000 options. On October 4, 2002, American Tower stock closed at $1.07, near the bottom of a sharp drop in the price of American Tower common stock, and preceding a sharp price increase. American Tower stock quickly reached as high as $4.10 per share on December 2, 2002.



**American Tower Corp.**

**September 4, 2002 - November 4, 2002**

44.     As a result of the backdating of stock options issued to Defendant Dodge and American Tower's other top insiders, Defendants have been unjustly enriched at the expense of American Tower, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated. These windfall profits have made Defendant Dodge, as well as the other Defendants, some of the highest paid executives in their industry.

45.     Moreover, throughout the relevant period Defendants Clark, Dodge, Eisenstein, Gearon, Lummis, Moskowitz, Singer, Taiclet, and Winn exercised many of these stock options permitting them to sell over $224 million worth of American Tower stock they obtained. The details of their stock sales are set forth in the chart below:

- 19 -

| Defendant | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| STEPHEN H. CLARK | 9/6/2005 | 59,687 | $23.700 | $1,414,582 |
| | 9/6/2005 | 36,000 | $23.650 | $851,400 |
| | 9/6/2005 | 34,700 | $23.550 | $817,185 |
| | 9/6/2005 | 29,600 | $23.540 | $696,784 |
| | 9/6/2005 | 28,100 | $23.530 | $661,193 |
| | 9/6/2005 | 24,800 | $23.500 | $582,800 |
| | 9/6/2005 | 16,900 | $23.580 | $398,502 |
| | 9/6/2005 | 16,200 | $23.450 | $379,890 |
| | 9/6/2005 | 15,700 | $23.510 | $369,107 |
| | 9/6/2005 | 13,700 | $23.430 | $320,991 |
| | 9/6/2005 | 12,600 | $23.750 | $299,250 |
| | 9/6/2005 | 11,200 | $23.620 | $264,544 |
| | 9/6/2005 | 11,100 | $23.470 | $260,517 |
| | 9/6/2005 | 8,200 | $23.720 | $194,504 |
| | 9/6/2005 | 7,900 | $23.760 | $187,704 |
| | 9/6/2005 | 7,300 | $23.460 | $171,258 |
| | 9/6/2005 | 6,600 | $23.670 | $156,222 |
| | 9/6/2005 | 6,500 | $23.680 | $153,920 |
| | 9/6/2005 | 6,300 | $23.630 | $148,869 |
| | 9/6/2005 | 6,000 | $23.570 | $141,420 |
| | 9/6/2005 | 5,500 | $23.600 | $129,800 |
| | 9/6/2005 | 5,300 | $23.560 | $124,868 |
| | 9/6/2005 | 5,200 | $23.590 | $122,668 |
| | 9/6/2005 | 5,100 | $23.610 | $120,411 |
| | 9/6/2005 | 5,100 | $23.640 | $120,564 |
| | 9/6/2005 | 4,100 | $23.690 | $97,129 |
| | 9/6/2005 | 3,400 | $23.740 | $80,716 |
| | 9/6/2005 | 2,600 | $23.770 | $61,802 |
| | 9/6/2005 | 2,400 | $23.660 | $56,784 |
| | 9/6/2005 | 1,900 | $23.730 | $45,087 |
| | 9/6/2005 | 1,000 | $23.490 | $23,490 |
| | 9/6/2005 | 700 | $23.440 | $16,408 |
| | 9/6/2005 | 700 | $23.520 | $16,464 |
| | 9/6/2005 | 100 | $23.710 | $2,371 |
| | 9/12/2005 | 41,300 | $24.600 | $1,015,980 |
| | 9/12/2005 | 36,187 | $24.500 | $886,582 |
| | 9/12/2005 | 31,300 | $24.700 | $773,110 |
| | 9/12/2005 | 24,800 | $24.550 | $608,840 |
| | 9/12/2005 | 23,000 | $24.570 | $565,110 |
| | 9/12/2005 | 19,900 | $24.460 | $486,754 |
| | 9/12/2005 | 13,600 | $24.540 | $333,744 |
| | 9/12/2005 | 11,800 | $24.650 | $290,870 |
| | 9/12/2005 | 11,700 | $24.710 | $289,107 |
| | 9/12/2005 | 9,700 | $24.560 | $238,232 |
| | 9/12/2005 | 9,000 | $24.580 | $221,220 |
| | 9/12/2005 | 8,300 | $24.590 | $204,097 |
| | 9/12/2005 | 8,000 | $24.620 | $196,960 |
| | 9/12/2005 | 6,800 | $24.640 | $167,552 |
| | 9/12/2005 | 4,200 | $24.790 | $104,118 |
| | 9/12/2005 | 4,000 | $24.730 | $98,920 |
| | 9/12/2005 | 4,000 | $24.770 | $99,080 |

- 20 -

| | 9/12/2005 | 3,300 | $24.680 | $81,444 |
|---|---|---|---|---|
| | 9/12/2005 | 1,600 | $24.510 | $39,216 |
| | 9/12/2005 | 1,500 | $24.520 | $36,780 |
| | 9/12/2005 | 1,400 | $24.610 | $34,454 |
| | 9/12/2005 | 1,200 | $24.630 | $29,556 |
| | 9/12/2005 | 1,100 | $24.760 | $27,236 |
| | 9/12/2005 | 1,000 | $24.670 | $24,670 |
| | 9/12/2005 | 1,000 | $24.690 | $24,690 |
| | 9/12/2005 | 1,000 | $24.740 | $24,740 |
| | 9/12/2005 | 800 | $24.530 | $19,624 |
| | 9/12/2005 | 700 | $24.780 | $17,346 |
| | 9/13/2005 | 26,200 | $24.890 | $652,118 |
| | 9/13/2005 | 19,400 | $24.950 | $484,030 |
| | 9/13/2005 | 17,100 | $24.900 | $425,790 |
| | 9/13/2005 | 10,000 | $24.940 | $249,400 |
| | 9/13/2005 | 10,000 | $24.970 | $249,700 |
| | 9/13/2005 | 10,000 | $25.000 | $250,000 |
| | 9/13/2005 | 8,100 | $24.840 | $201,204 |
| | 9/13/2005 | 6,300 | $24.850 | $156,555 |
| | 9/13/2005 | 5,000 | $24.880 | $124,400 |
| | 9/13/2005 | 3,700 | $24.820 | $91,834 |
| | 9/13/2005 | 2,100 | $24.960 | $52,416 |
| | 9/13/2005 | 1,900 | $24.860 | $47,234 |
| | 9/13/2005 | 200 | $24.910 | $4,982 |
| | 9/19/2005 | 35,000 | $25.000 | $875,000 |
| | 9/19/2005 | 29,600 | $24.620 | $728,752 |
| | 9/19/2005 | 23,000 | $25.020 | $575,460 |
| | 9/19/2005 | 16,300 | $25.010 | $407,663 |
| | 9/19/2005 | 12,187 | $24.940 | $303,944 |
| | 9/19/2005 | 10,000 | $24.630 | $246,300 |
| | 9/19/2005 | 10,000 | $25.040 | $250,400 |
| | 9/19/2005 | 7,400 | $24.800 | $183,520 |
| | 9/19/2005 | 6,800 | $24.660 | $167,688 |
| | 9/19/2005 | 6,100 | $24.740 | $150,914 |
| | 9/19/2005 | 5,500 | $24.640 | $135,520 |
| | 9/19/2005 | 5,500 | $24.700 | $135,850 |
| | 9/19/2005 | 4,900 | $24.950 | $122,255 |
| | 9/19/2005 | 4,200 | $24.650 | $103,530 |
| | 9/19/2005 | 3,700 | $24.850 | $91,945 |
| | 9/19/2005 | 3,600 | $24.670 | $88,812 |
| | 9/19/2005 | 3,600 | $24.840 | $89,424 |
| | 9/19/2005 | 2,900 | $24.890 | $72,181 |
| | 9/19/2005 | 2,500 | $24.610 | $61,525 |
| | 9/19/2005 | 1,600 | $24.750 | $39,600 |
| | 9/19/2005 | 1,400 | $24.810 | $34,734 |
| | 9/19/2005 | 1,100 | $24.760 | $27,236 |
| | 9/19/2005 | 1,100 | $24.780 | $27,258 |
| | 9/19/2005 | 1,100 | $24.870 | $27,357 |
| | 9/19/2005 | 800 | $24.680 | $19,744 |
| | 9/19/2005 | 800 | $24.690 | $19,752 |
| | 9/19/2005 | 700 | $24.830 | $17,381 |
| | 9/19/2005 | 600 | $24.600 | $14,760 |